[Civ. No. 17987. First Dist., Div. Two. Aug. 13, 1958.]

ALMA H. JAMES, Respondent, v. ESTHER O. PAWSEY, as Executrix, etc., Appellant.

Bray, Baldwin & Ogden for Appellant.

Louis J. McKannay and A. J. Engleking for Respondent.

KAUFMAN, P. J.—Defendant appeals from a judgment in favor of the plaintiff, in an action to impress a trust and quiet title to Lots 6, 11, and 12 of Block 5 in the City of Martinez. Plaintiff is the third party donee beneficiary of an agreement made in 1922 by plaintiff's parents and plaintiff's aunt on her mother's side, Laura D. Hollenbeck. The defendant, Esther O. Pawsey, is another sister of Laura D. Hollenbeck. Defendant claims Lots 6, 11, and 12 as the residuary devisee of the Will of Laura D. Hollenbeck, and asserts the defenses of rescission, laches, and estoppel to the enforcement of the 1922 agreement.

A detailed exposition of the facts is necessary to understand the issues involved in this family controversy. In 1913, Henry M. Hollenbeck conveyed Lots 4, 5, 6, 11 and 12, and the West half of Lot 13 in Block 5 in the City of Martinez, to his daughter Laura. Plaintiff's parents, Charlotte Hollenbeck Lytton and R. V. Lytton were married in 1914. In 1915,

R. V. Lytton and Charlotte Lytton moved into the old Hollenbeck family home located on Lot 6, where they lived for 36 years. During the next few years, R. V. Lytton and Charlotte Lytton bought the remaining adjoining parcels of property not owned by Laura Hollenbeck, Lots 7, 8, and 9 of Block 5. R. V. Lytton installed electrical wiring and made many other improvements on the old family home property. In 1920 Laura Hollenbeck moved into the old family home with the Lyttons.

On August 7, 1922, R. V. Lytton, Charlotte Lytton and Laura D. Hollenbeck executed in triplicate an agreement which was drafted by Mr. Wight, the family attorney. The agreement stated that as all the parties desired to provide for the care and support of Mrs. C. J. Hollenbeck and the care, support and education of Alma H. Lytton, all of their property, both real and personal that parties possessed at the time of the agreement or would acquire in the future, was to be held jointly, share and share alike. The agreement further provided that in the event of the death of one of the parties, the property would become the property of the survivors, and that the final survivor was to transfer or devise all of the property to Alma H. Lytton. The agreement stated that all parties would execute all devises and deeds necessary for the execution of the agreement. The agreement also contained a recital of consideration, and was signed and sealed by all of the parties.

At the same time, the parties executed mutual wills pursuant to the agreement. The agreement was not recorded until 1950. In August 1922, R. V. Lytton and Charlotte Lytton had an agreement to purchase Lots 2, 3, and the East half of Lot 13. They acquired these properties on September 14, 1922. On September 1, 1923, they acquired Lot 1. For the next 27 years the parties lived together pursuant to the agreement. The earnings and income of R. V. Lytton and Laura D. Hollenbeck were turned over to Charlotte Lytton who managed the finances for the entire family. Charlotte Lytton collected the rents on all the properties and paid all taxes due. R. V. Lytton built a second house on Lot 6; he also built and paid for a house on Lot 11. For some time after her marriage in 1939, plaintiff lived in the house on Lot 11. Except for short absences on home nursing jobs and vacations to visit another sister in Los Angeles, Laura D. Hollenbeck continually lived with the Lyttons.

Charlotte Lytton died on July 31, 1949. Her property was

distributed in accordance with her will made pursuant to the 1922 agreement. R. V. Lytton and Laura D. Hollenbeck each received an undivided one-half interest in Lots 1, 2, 3, 7, 8, 9, and the East half of Lot 13. R. V. Lytton went to live with the plaintiff in the house on Lot 11. After the death of her mother, plaintiff collected the rents and paid the expenses on the various parcels of property owned by her father and her aunt. Certain street work that had to be done for Lots 2, 3, 4, 5, 6, 7 and 8 at this time, was paid for out of the "general fund" and $1,000 borrowed by R. V. Lytton.

Some time in 1951 R. V. Lytton and Laura D. Hollenbeck decided to separate their properties. On January 4, 1952, Mr. Wight, who was R. V. Lytton's attorney, wrote to Mr. Fraga, who was Laura D. Hollenbeck's attorney, as follows: (in part)

"Of course from a legal standpoint the agreement must be given full consideration. The three parties, in good faith, entered into the agreement, and in accordance therewith, and as provided therein, made their wills accordingly, and as we know, proceeded in the carrying out of the agreement. One of the parties to the agreement is deceased, and her will made out in accordance with said agreement was probated and distribution made accordingly, which was in accordance with both the will and the agreement. By reason thereof there is a vested interest in the beneficiaries thereunder, which, in my opinion will need to be fully considered in any attempt at cancellation of the agreement. I am sure that the two Lytton daughters, who are the beneficiaries, will cooperate in any just plan in the matter."

On February 21, 1952, R. V. Lytton and Laura D. Hollenbeck entered into an agreement to rescind the agreement of 1922 and separate their respective interests in all property. Under the 1952 agreement, each party agreed to waive all rights and claims in the property of the other, arising out of the agreement of 1922, and each agreed to quit claim to the other all of his interest in the property of the other. Accordingly, R. V. Lytton quit claimed all of his interest in Lots 4, 5, 6, 11, 12 and the West half of Lot 13 to Laura Hollenbeck; Laura Hollenbeck quit claimed to R. V. Lytton all of her interest in Lots 1, 2, 3, 7, 8, 9, and the East half of Lot 13.

Plaintiff ceased collecting rents and managing the properties, after she found out in 1952, that her father and aunt were planning to separate their properties. Plaintiff sought independent advice as to the effect of the 1952 agreement and was advised that this agreement in no way affected her rights.

After the 1952 agreement, Laura D. Hollenbeck resumed the management of her properties until her illness. The defendant then took over the management of these properties and also cared for Laura and paid the expenses of her last illness and burial.

Laura D. Hollenbeck died on July 17, 1955. Her will, executed on January 29, 1952 (almost one month before the agreement with R. V. Lytton) was admitted to probate. This will revoked all prior wills, named the defendant as executrix, left one ($1.00) dollar to the plaintiff, one ($1.00) dollar to the plaintiff's sister, Ina Lytton, and the residue of the property to the defendant.

On November 17, 1955, defendant filed an inventory and appraisement of the Estate of Laura D. Hollenbeck, listing Lots 6, 11, 12 as the sole assets of the estate. Lots 4 and 5 and the West half of Lot 13 had been sold by Laura Hollenbeck to one Johnson in June, 1955. Plaintiff filed her complaint seeking declaratory relief, a declaration of trust, and quiet title, in this action on December 20, 1955. R. V. Lytton and Ina Lytton were also named as defendants. On their failure to answer, a default was entered on the first day of trial. During the trial it was ascertained that there was additional personal property in the Estate of Laura D. Hollenbeck. The court made findings of fact and the following conclusions of law:

"1. That the Agreement of 1922 entered into by and between R. V. Lytton, Charlotte J. Lytton, his wife, and Laura D. Hollenbeck was, and is, a valid and binding agreement between said parties.

"2. That by virtue of the actions of the said R. V. Lytton, Charlotte J. Lytton, his wife, and Laura D. Hollenbeck and by virtue of the decree of distribution in the Estate of Charlotte J. Lytton, the survivors R. V. Lytton and Laura D. Hollenbeck became, were, and are, estopped from making any other or different disposition of their property other than as in said agreement of 1922 provided.

"3. That the agreement between R. V. Lytton and Laura D. Hollenbeck, dated February 21, 1952, had no effect on the rights of plaintiff, Alma H. James, formerly Alma H. Lytton, in or to the property of the said Laura D. Hollenbeck.

"4. That during her lifetime the decedent, Laura D. Hollenbeck, held and owned her real property in trust for Alma H. James, subject only to the right of said decedent to maintain and support herself therefrom.

"5. That the said parcels of real property, to-wit: Lots 6, 11 and 12, all in Block 5, as shown on the original survey of the Town of Martinez, are not property of the estate of the said Laura D. Hollenbeck, and the said Esther O. Pawsey, individually, and Esther O. Pawsey as Executrix of the Estate of Laura D. Hollenbeck, and all other persons claiming under her and all heirs at law of the said Laura D. Hollenbeck, deceased, be, and they are hereby, restrained and enjoined from claiming or asserting any right, title, or interest in or to said real property, except as to the lien of Esther O. Pawsey, individually, as hereinafter set forth.

"6. That plaintiff, Alma H. James, is entitled to have judgment entered in her favor and against Esther O. Pawsey, individually, and Esther O. Pawsey as Executrix of the Estate of Laura D. Hollenbeck, and R. V. Lytton and Ina Lytton, and that she, the said plaintiff, is the owner of Lots 6, 11 and 12, all in Block 5, as the same are laid out and delineated on the map of the original survey of the Town of Martinez, as recorded in the office of the County Recorder of the County of Contra Costa, State of California, free and clear of any and all claim of right, title or interest of Esther O. Pawsey, individually, Esther O. Pawsey as Executrix of the Estate of Laura D. Hollenbeck, and all heirs, legatees, devisees, creditors, and any and all other persons having any claim against, or interest in, the Estate of the said Laura D. Hollenbeck, deceased. That Esther O. Pawsey, individually, be, and she is hereby granted a lien, against said parcels of real property, in the sum of $600.00, for taxes, assessments, repairs and maintenance paid by the said Esther O. Pawsey for the benefit of the said real property.

"7. That plaintiff have and recover her costs of suit herein against said defendants. Judgment is hereby ordered to be entered accordingly."

Defendant, on appeal, contends that the trial court erred as:

(1) The agreement of August 7, 1922, was not an inter vivos transfer and conveyance, but merely an agreement to make mutual wills, which could be revoked prior to the third party beneficiary's reliance thereon.

(2) The rescission of February 21, 1952, was effective as Charlotte Lytton had only a mere expectancy dependent on her survivorship in the community property which was the subject of the 1922 agreement, and therefore could not devise anything to her husband and her sister.

(3) Plaintiff is guilty of laches as she has had actual and constructive knowledge of defendant's claim for four years before the filing of this action.

(4) Plaintiff is estopped from denying the validity of defendant's claim because of plaintiff's inconsistent action with respect to Lots 1, 2, 3, 7, 8, 9, and the east one-half of Lot 13.

■ Both parties agree that the agreement of 1922, is a valid third party beneficiary agreement. Defendant, relying on Civil Code section 1559, argues that the agreement was rescinded before reliance thereon by the plaintiff. ■ The parties to a contract entered into for the benefit of third persons may rescind or abrogate it without the assent of such third persons, at any time before the contract is accepted, adopted, or acted upon by such third persons. (*Riley* v. *Riley,* 118 Cal.App.2d 11 [256 P.2d 1056] ; 17 C.J.S. 398; Restatement of Contracts, § 142, p. 168.) ■ Acceptance by a third party donee beneficiary so as to preclude rescission without the consent of the beneficiary, in the absence of a reservation of a right to rescind, will be presumed, where the beneficiary, like the plaintiff here, is an infant at the time of the making of the contract. (*Rhodes* v. *Rhodes* (Ky. App.), 266 S.W.2d 790 [44 A.L.R.2d 1266] ; *Waterman* v. *Morgan,* 114 Ind. 237 [16 N.E. 590].) ■ The agreement in question was an agreement to make mutual wills. It is well settled in this state that such agreements may be enforced at law or in equity by the beneficiary. ■ In *Brown* v. *Superior Court,* 34 Cal.2d 559, the court said at pages 564 and 565 [212 P.2d 878] :

"The contracting party who survives becomes estopped from making any other or different disposition of the property, and his obligations under the agreement become absolutely irrevocable and enforceable against him, at least where he avails himself of the provisions of decedent's will in his favor and accepts substantial benefits thereunder. (*Notten* v. *Mensing,* 3 Cal.2d 469, 473 [45 P.2d 198] ; *Sonnicksen* v. *Sonnicksen,* 45 Cal.App.2d 46, 52-55 [113 P.2d 495] ; see *Rolls* v. *Allen,* 204 Cal. 604, 609 [269 P. 450].) . . .

■ "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement. (Citations.) ■ Where the parties contract to make a particular disposition of property by will, the agreement necessarily includes a promise not to breach the contract by revoking the will and failing to dispose of the property as agreed. ■ The rights of the parties

depend upon the contract, and the revocation of the will or other breach of the contract does not prevent the intended devisee or legatee from enforcing the contractual obligations. (Citations.) As pointed out in *Estate of Rolls*, 193 Cal. 594, 601-602 [226 P. 608], while a will is revocable under section 23 of the Probate Code and the parties contract with knowledge of this fact, the obligation to make the agreed disposition may still be enforced.''

The agreement in controversy here differs from the usual mutual will agreement only in that there are three contracting parties instead of the usual number of two. There is the further difference that in the case of the usual mutual will contract there is no consideration until one party dies and disposes of his property in accordance with the agreement. Here, all of the parties gave up rights and incurred obligations from the moment the agreement was executed. For 27 years, R. V. Lytton, Charlotte Lytton, and Laura Hollenbeck pooled all of their property, real and personal.

Defendant's second contention is that Charlotte Lytton was not a necessary party to the 1922 agreement, as she had only a mere expectancy in the community property. It is not disputed that all of the property owned by R. V. Lytton and Charlotte Lytton at the time of the agreement was community property, or that before 1923, a wife had no testamentary power to dispose of her half of the community property. However, as pointed out in *Estate of Brix*, 181 Cal. 667 at page 676 [186 P. 135]:

''While the wife has no title to the community property nor estate or interest therein, yet she has rights in relation thereto, the surrender of which may constitute a valuable and, according to the circumstances of the case, an adequate consideration for the transfer. She has a 'possible interest in whatever remains upon the dissolution of the community otherwise than by her own death.' (*In re Burdick*, 112 Cal. 393 [44 P. 735].)''

Furthermore, it has long been the law in this state that a husband and wife can enter into an agreement concerning their community property rights. The separate property of each may be converted into community property and the community property of both may likewise be converted into the separate property of both or either. (*Siberell* v. *Siberell*, 214 Cal. 767 [7 P.2d 1003].) In *Perkins* v. *Sunset Tel. & Tel. Co.*, 155 Cal. 712, the court said at pages 719 and 720 [103 P. 190]:

"Under our law there can be no doubt that a husband and wife may enter into a contract with respect to their property whereby one may release to the other all interest, both present and in expectancy. (Citations.) In the case last cited the following language is used: 'There can be no doubt that the husband may make a gift of the community property to the wife, and that the effect of such gift will be to transmute it into her separate estate. . . .' "

■ An agreement between spouses to change the character of property from community to separate need not be executed with any particular formality. (*Woods* v. *Security-First Nat. Bank*, 46 Cal.2d 697 [299 P.2d 657]; *Nevins* v. *Nevins*, 129 Cal.App.2d 150 [276 P.2d 655].) Such an agreement may be express or implied. (*Long* v. *Long*, 88 Cal.App. 2d 544 [199 P. 47].) ■ The change in the status of the property may be shown by the nature of the transaction or appear from the surrounding circumstances. (*Title Insurance etc. Co.* v. *Ingersoll*, 153 Cal. 1 [94 P. 94].) The purpose of the 1922 agreement is clearly stated to pool all property of the parties "for the mutual advantage of the parties" and "whereas all of the parties desire to provide for the care and support of Mrs. C. J. Hollenbeck during her lifetime and for the care, education and support of Alma H. Lytton."

■ We think that the only sensible construction of the 1922 agreement is an implied gift by R. V. Lytton of community property to Charlotte Lytton. It follows therefore that Charlotte Lytton was an essential party to the 1922 agreement, and we cannot agree therefore with the defendant's argument that on the death of Charlotte Lytton all of the community property passed to R. V. Lytton and that he made a gift of one-half thereof to Laura D. Hollenbeck. On the death of Charlotte Lytton her property was devised in accordance with the 1922 agreement. ■ R. V. Lytton and Laura D. Hollenbeck accepted the benefits of the will of Charlotte Lytton. It follows that the 1952 agreement was effective only against the parties thereto and had no effect on the plaintiff's interest.

There remains for consideration only defendant's remaining contentions of laches and estoppel.

■ Plaintiff alleged in her complaint that she did not know of the 1922 agreement until after the death of her aunt, Laura Hollenbeck, in 1955. At the trial, plaintiff testified she had never seen the agreement, but that her mother had told her about it when she was about 12 or 13, and told her the

property would go to plaintiff and plaintiff's sister. C. V. Lytton and Mr. Wight, testified that the plaintiff did not know about the 1922 agreement until the death of Laura Hollenbeck.

In her deposition, plaintiff admitted knowledge of the 1952 agreement in 1952, at the time she sought the advice of her attorney. There is uncontroverted evidence, however, that plaintiff had been advised by her attorney that the 1952 agreement had no effect on her interest. Plaintiff testified that she understood that the rescission was only between her father and her aunt, and had no effect on her or her sister. The existence of laches is a question of fact for the trial court. (*Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718 [134 P.2d 777].) We think the trial court's conclusion on this issue finds support in the evidence.

Defendant's final contention is that certain inconsistent actions taken by the plaintiff estop her from denying the validity of the defendant's claim. The evidence on this issue is as follows:

On February 27, 1952, R. V. Lytton by grant deed conveyed Lots 1, 2, 3, 7, 8, 9, and the West portion of Lot 13 to the plaintiff and her sister, Ina, reserving to himself a life estate. On August 7, 1953, plaintiff joined her father and sister in two deeds: one conveying Lots 2 and 3 and the East half of Lot 13 to her, subject to a life estate in R. V. Lytton, and the second granting Lots 1, 7, 8, and 9 to Ina Lytton, subject to a life estate in R. V. Lytton. The property, which is the subject of this controversy, are Lots 6, 11, and 12. There is also evidence that in 1952, plaintiff had the insurance changed so that her aunt Laura Hollenbeck would be responsible for the premiums. The existence of estoppel is also a question of fact to be determined by the trial court. (*General Motors Accept. Corp.* v. *Gandy*, 200 Cal. 284 [253 P. 137].) We think the trial court correctly declined to apply the harsh doctrine of estoppel here. A fair correct and equitable result on all issues was reached.

In view of the foregoing the judgment is hereby affirmed.

Dooling, J., and Draper, J., concurred.