## SPATES v. SPATES

[No. 43, September Term, 1972.]

*Decided November 15, 1972.*

*Motion for rehearing filed December 15, 1972; denied December 29, 1972.*

The cause was argued before MURPHY, C. J., and MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Charles B. Murray* for appellant.

*Charles U. Price,* with whom was *Daniel B. Wiegers* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

The appellant, Robert L. Spates (Robert), failing in his effort in the Circuit Court for Montgomery County to assert his rights as third-party beneficiary of a separation agreement entered into between his father, Alfred W. Spates (Alfred) and his mother, Helen A. Spates, later Helen A. Ferris (Helen), has taken this appeal.

The facts are essentially these. Alfred and Helen were married in 1929. Two children were born of the marriage, a daughter, Jane, not a party to this cause, and Robert, who was born on 23 March 1932. The marriage deteriorated, and on 10 June 1949, when Jane was 19 and Robert, 17, Alfred and Helen entered into an agreement of separation and property settlement. At the time of the marriage, Alfred was a Montgomery County farmer. When the separation occurred, he was a member of the bar.

At that time, the parties were living on the 180-acre property near Germantown, known as the Musser farm, owned by Alfred. Helen and Alfred, as tenants by the entireties, held title to the Metz farm, containing something less than 100 acres, nearby, the latter farm having been purchased in April 1948 for $12,500.00.

On 28 July 1949, in an action instituted by Helen against Alfred in Carson City, Nevada, in which Alfred

had entered an appearance and waived notice, a decree was entered, divorcing Helen *a vinculo* from Alfred, approving the agreement of separation and property settlement, incorporating the agreement into the decree, and directing the parties to abide by the terms of the agreement.

It is the agreement, of course, which is the nub of this controversy. In essence, it provided:

  (i)  That Helen was to have custody and guardianship of Jane and Robert, with reasonable rights of visitation in Alfred;

  (ii)  That Alfred would provide clothing for Robert; and Helen, for Jane;

  (iii)  That Helen would support Jane and Robert, but Alfred would pay Jane's tuition fees;

  (iv)  That Helen was to have the household furniture, but that all other personal property should be the property of Alfred and Robert;

  (v)  That Helen was to have the right to occupy the dwelling on the 180-acre Musser farm, until a note for $10,000.00, given Helen by Alfred, was paid; with the proviso, however, that the Musser farm was Alfred's, together with the right to farm it, subject to the limitation "that said property is not to be sold unless to Robert . . . ." [1]

The critical provision which is at issue here is quoted in full:

". . . And it is further understood, agreed and covenanted by the parties hereto that Alfred . . . , husband, Helen . . . , wife, and Robert . . . , their infant son, shall each have an undivided one-third interest in all those two tracts of land, containing one hundred acres, more or less [the Metz farm], as described in a deed from William Frederick Metz and wife to the parties hereto, dated April 28, 1948, and re-

---

1. This provision is not at issue here.

corded among the Land Records of Montgomery County, Maryland, until the payment of the promissory note mentioned in paragraph [(v)] above is paid in full; *and upon the payment of said note the said Helen . . . covenants and agrees to execute such deed or deeds as may be necessary to convey her one-third undivided interest in said land and premises to the said Alfred . . . and Robert . . . , as tenants in common, whereby the said Alfred . . . and Robert . . . shall each have undivided one-half interest in said property.*" (Emphasis supplied)

In October 1952, Helen married Clarence A. Ferris, with whom she lived for a time on the Musser farm, and later in Bethesda. It was not until September 1954 that Alfred gave Helen the note for $10,000.00 payable 10 June 1959, which was called for by the agreement.

On 17 October 1955, Alfred satisfied the $10,000.00 note held by Helen, nearly four years before he was required to do so. On the same day Helen formally released Alfred from any further claim, and by deed in which her then husband, Clarence Ferris, joined, recorded among the Land Records of Montgomery County, conveyed all her right, title and interest in the Metz farm to Alfred.

Robert testified on deposition that he had heard rumors at the time of the divorce that he was to have an interest in the Metz farm. He said that his mother, in 1960 or 1961, shortly before her death in November 1961, had told him that his "father has taken my [Helen's] name off of the deed, of the Metz deed and he didn't put yours [Robert's] on like he was supposed to" but that he did not learn of the provisions of the agreement of separation and property settlement until September of 1970, when a friend obtained a certified copy of the Nevada divorce proceedings.

In June 1969, Alfred had sold 138 acres out of the Musser tract for $829,500.00, and later sold an additional

28 acres for $404,960.00. In December 1969, Alfred sold 27 acres from the Metz farm for $327,944.00 and in January 1970, an additional 43 acres for a price to be computed at $2,000.00 per lot. This tract was valued by Robert's expert appraiser at $259,343.00.[2] Robert said that he had questioned Alfred about whether he was selling his farm and Alfred had given a negative reply.

In May of 1970, Robert had asked James T. Lynch, a neighbor and a lawyer, to examine the Montgomery County Land Records with a view of determining whether Robert had any interest in the Metz farm. When the examination developed no indication of such an interest, Lynch suggested that he examine the record of the Nevada divorce proceeding on his way to California. As it turned out, he was unable to do this for several months, but when he located the decree in August of 1970, he telephoned Robert.

In September of 1970, Robert brought suit against Alfred, asking that full faith and credit be given the Nevada decree, seeking an accounting for one-half of the profits derived from the Metz farm, asking that a trust be imposed on all sums received by Alfred, praying that an injunction be issued against the making of further payments by the contract purchasers, and seeking a partition of the real property and an award of exemplary damages. Alfred answered, alleging that the property settlement agreement had been fully performed by his payment of $10,000.00 to Helen and the delivery of her release and deed, and interposing the defense of limitations and laches.

The lower court concluded that Alfred and Helen had the right to rescind the agreement, and did in fact rescind it; that their ability to effect a rescission was not altered by the incorporation of the agreement in the Nevada decree, and that additionally, Robert's suit was barred by limitations and laches. From an order dis-

---

2. The chancellor did not resort to hyperbole when he noted that a "modest investment . . . has turned into a pot of gold."

missing the bill of complaint, Robert entered a timely appeal.

The critical thrust of Robert's argument is twofold:

(i) That because Robert was an infant when Alfred and Helen entered into the agreement, it could not be rescinded by them, and

(ii) That his right of action is not barred by limitations or laches.

We shall consider these contentions in order.

## (i)

The right of third parties to sue and recover on a contract of which they were intended beneficiaries but to which they were not privy (although they must be privy to the promise) is well recognized in Maryland. *Compare Shillman v. Hobstetter,* 249 Md. 678, 687-90, 241 A. 2d 570 (1968) *with Hamilton & Spiegel, Inc. v. Board of Education of Montgomery County,* 233 Md. 196, 199, 195 A. 2d 710 (1963) ; *Marlboro Shirt Co. v. American Dist. Telegraph Co.,* 196 Md. 565, 569, 77 A. 2d 776 (1951) and *Mackubin v. Curtiss-Wright Corp.,* 190 Md. 52, 56-57, 57 A. 2d 318 (1948). *See also* Restatement, *Contracts* § 133, at 151 (1932) ; 4 *Corbin on Contracts* §§ 772, 776, at 2, 14 (1951) ; 2 *Williston on Contracts* § 356, at 823 (3d ed. Jaeger 1959). We have also adopted the definitions of donee beneficiary, creditor beneficiary and incidental beneficiary contained in Restatement, *Contracts* § 133, at 151-52 (1932) ; *Marlboro Shirt Co. v. American Dist. Telegraph Co., supra,* 196 Md. at 571-72.[3]

While we have been referred to no Maryland case, the old Restatement rule is that the promisor and promisee can make no change in the promise made to a donee beneficiary unless such a power is reserved, Restatement,

---

3. Restatement (Second), *Contracts* § 142, Reporter's Note, at 66 (Tent. Draft No. 3, 1967) has abandoned the distinction between donee beneficiaries and creditor beneficiaries because of doctrinal difficulties and now has two categories only: intended beneficiaries and incidental beneficiaries.

*Contracts* § 142, at 168 (1932). Nor can a change be made by the promisor and promisee in the promise made to a creditor beneficiary if he has changed his position in reliance on the promise, Restatement, *Contracts* § 143, at 168 (1932). *See also* Page, *The Power of Contracting Parties to Alter a Contract for Rendering Performance to a Third Person,* 12 Wis. L. Rev. 141, 149-50 (1937). Restatement (Second), *Contracts* § 142 (Tent. Draft No. 3, 1967) eliminates this distinction and provides that modification by the promisor and promisee is ineffective only if the agreement so provides, unless the third-party beneficiary has changed his position in reliance on the promise or has manifested assent to it.[4] *See also* 17 Am. Jur. 2d *Contracts* § 317, at 745 (1964).

What takes this case out of the majority rule, as adopted by the Restatement (Second), *Contracts* § 142 (Tent. Draft 1967), however, is that Robert was 17 at the time the agreement of separation and property settlement was entered into. There is substantial authority for the view that once an infant is made the donee beneficiary of a contract between a promisor and promisee, his acceptance of the benefit is assumed, and his rights under the contract are indefeasible, unless he rejects the benefits, or a right to alter the provision made for him has been reserved, 2 *Williston, supra* § 396, at 1067; *see* 4 *Corbin, supra* § 814, at 247 (1951, Supp. 1971, at 97-98) and Restatement (Second), *Contracts* § 142, comment d, at 60 (Tent. Draft No. 3, 1967). There is what Williston terms "weighty authority" in support of this view: *James v. Pawsey,* 162 Cal. App. 2d 740, 328 P. 2d 1023, 1028 (1958); *Waterman v. Morgan,* 114 Ind. 237, 16 N. E. 590, 592 (1888); *Henderson v. McDonald,* 84 Ind. 149, 153 (1882); *Rhodes v. Rhodes,* 266 S.W.2d 790, 792-93 (Ky. 1953); *Quinn v. Thigpen,* 266 N. C. 720, 147 S.E.2d 191, 194 (1966); *Thayer v. Thayer,* 189 N. C.

---

4. We accept the chancellor's conclusion that Robert was a donee beneficiary and not a creditor beneficiary. A promise to convey an interest in the farm 10 years later is unrelated to Alfred's legal obligation to support Robert from age 17 to age 21.

502, 127 S. E. 553, 555, 556 (1925) ; *Plunkett v. Atkins,* 371 P. 2d 727, 731-32 (Okla. 1962) ; *Brill v. Brill,* 282 Pa. 276, 127 A. 840, 843 (1925) ; Anno., 39 A.L.R. 434, 448-49 (1925) ; Note, *Third Party Beneficiary Concept: A Proposal,* 57 Colum. L. Rev. 406, 420 (1957), and little authority to the contrary, *Lehman v. Stout,* 261 Minn. 384, 112 N.W.2d 640, 646 (1961) ; *Plott v. Kittelson,* 58 N. D. 881, 228 N. W. 217, 221-22 (1929).

In a proper case, we might well adopt this line of authority, which is urged on us by Robert. Here, we do so only for purposes of argument, to the end that we may consider the defense of limitations, relied upon by Alfred.

### (ii)

The agreement of separation and property settlement was not under seal, and standing alone, would have been subject to the three year statute of limitations provided by Maryland Code (1957, 1972 Repl. Vol.) Art. 57, § 1. However, once the agreement was incorporated into a decree, we shall assume for the purposes of the case that the agreement was subject to the 12 year period applied to specialties by Code Art. 57, § 3, *see Bradford v. Futrell,* 225 Md. 512, 522-23, 171 A. 2d 493 (1961) ; *Marshall v. Marshall,* 164 Md. 107, 114-15, 163 A. 874 (1933).

4 *Corbin, supra* § 820, at 278-81 suggests that concomitantly with the fiction of the minor donee's acceptance or consent should run an equally artificial concept —that limitations run from the date of the breach.[5] In this case, limitations would have commenced to run on 10 June 1949, except for the provisions of Code Art. 57, § 2 that the running of limitations against a minor begins to run when he attains his majority.

We readily concede that the idea that limitations run against a third-party beneficiary who is a minor from

---

5. Which here, would have been the date of the agreement, since Alfred and Helen undertook to vest an immediate one-third interest in the Metz Farm in Robert.

the date the contract is breached and not from the date when he learns of it, subject to the tolling of the statute during minority, seems artificial, but certainly no more artificial than the presumption of the minor's acceptance.

Lord Blackburn's comment in *Kendall v. Hamilton,* 4 Appeal Cases 504, 544 (1879) cited by Corbin, seems especially apt, particularly if paraphrased by the insertion of names:

> "I do not see that [Alfred] does anything inequitable in taking advantage of the defence which the law gives him. [Robert] got a right by operation of law, without any merits of [his] own, by what, as far as regards [him], was pure good luck. [He has] lost it by what was no fault of [his], but was, as far as [he was] concerned, pure bad luck. If [Robert was] willing to take advantage of [his] good luck against [Alfred], it seems no hardship that [Alfred] should take advantage of [Robert's] bad luck against [him]."

Robert attained age 21 on 23 March 1953, and had the statute commenced to run when the agreement was signed (on the theory that Alfred and Helen undertook to vest an immediate one-third interest in the Metz farm in Robert), except for its having been tolled during his minority, any action by Robert was barred in 1965. Even if we follow the normal rule that limitations run from the date when the cause of action arose under that portion of the contract which was executory and not from the date of the promise, *Killen v. George Washington Cemetery,* 231 Md. 337, 343, 190 A. 2d 247 (1963) ; *Winand v. Case,* 154 F. Supp. 529, 536 (D. Md. 1957), the breach by Helen (or by Helen and Alfred) in October 1955 could not be the subject of a suit after October 1967.

As a consequence, Robert's action was barred by limitations. Although he sued in equity, he could have sued at law for damages, with the result that limitations are applied in equity by analogy where the remedies are

concurrent, *Rettaliata v. Sullivan,* 208 Md. 617, 621, 119 A. 2d 420 (1956).

The court below (Joseph M. Mathias, J.) made a specific finding on the evidence that Alfred thought he and Helen "were free to deal with the Metz farm as they chose and that there was no deliberate or fraudulent attempt to deprive Robert of any legal interest he may have had," a finding which we shall not disturb, Maryland Rule 886.

By 1961, Robert knew that Helen believed the agreement to have been breached. He not only took no action then (when he could have done so) but according to his own testimony and that of his father, Robert never discussed the matter with Alfred at any time prior to the institution of suit. If the result seems harsh, it was the bitter fruit of Robert's inertia.

> *Order affirmed, costs to be paid by appellant.*